UNITED STATES of America

v.

Michael J. WHITE.

Crim. No. 94–10013–PBS.

United States District Court,
D. Massachusetts.

June 10, 1994.

**14**

Carole S. Schwartz, U.S. Atty's. Office, Organized Crime Strike Force, Boston, MA,. for plaintiff.

Cerise H. Lim–Epstein, Goodwin, Proctor & Hoar, Boston, MA, for defendant.

*MEMORANDUM AND ORDER RE GLOBE'S MOTION FOR ACCESS TO TITLE III MATERIAL*

SARIS, District Judge.

## INTRODUCTION

The Globe Newspaper Company ("the Globe") seeks access to an exhibit which was introduced at a suppression hearing on the ground that it has a First Amendment and common law right of access. The court impounded the exhibit, at the government's request, because it contained a transcript of a conversation intercepted pursuant to Title III, 18 U.S.C. §§ 2510–2521 (1988), which had not yet been tested in a related case. After hearing, the motion is *ALLOWED.*

## BACKGROUND

Michael J. White, a former assistant clerk magistrate of the Boston Municipal Court, was indicted in a three count indictment charging him with racketeering in violation of 18 U.S.C. § 1962(c) and (d) and with conspiracy to obstruct enforcement of the state criminal laws with intent to facilitate an illegal gambling business in violation of 18 U.S.C. § 1511. Among other things, the indictment alleges that, as part of the so-called "Ping On" conspiracy, White solicited and accepted money from Michael Kwong, now deceased, and others in return for providing advance warning of the Boston Police Department's efforts to crack down on the Ping On's illegal gambling businesses controlled by Kwong and his associates.

On January 14, 1994, defendant was arraigned, and on February 25, 1994, he moved to suppress his January 10, 1992 statements to agents of the Federal Bureau of Investigation. Claiming those statements were "involuntary" and thus obtained in violation of the Fifth Amendment, White also asked the court to declare two years worth of subsequent statements, including his grand jury testimony, as inadmissible "fruits of the poisonous tree." Finally, he sought sanctions for government misconduct. White did not move to suppress the transcript of a June 25, 1989 electronically intercepted conversation ("the intercepted communication") between himself and Kwong, pursuant to 18 U.S.C. § 2518(10)(a). The substance of the conversation was summarized in the indictment, ¶ 8(c) at 6. The taped conversation was used by the government in obtaining a confession from White on January 10, 1992.

A hearing was held on March 22 and 23, 1994, at which Thomas A. Hughes, former Special Agent in Charge of the Boston FBI ("Hughes"), and Special Agent James M. Siracusa ("Siracusa") testified for the government. At the hearing, defendant moved to introduce as an exhibit a preliminary transcript of the intercepted conversation to support his claim that the government agent tricked him into confessing by overstating the strength of the case. Agent Siracusa testified about a conversation in the transcript in which Kwong offered White "five a week." The government objected to public disclosure of the transcript on the dual grounds that the transcript was preliminary and that it was sealed pursuant to Title III, 18 U.S.C. § 2518(8)(a). Two members of the press were present in the courtroom. The Court allowed introduction of the document, as Exhibit 13, impounded it pursuant to 18 U.S.C. § 2518(8)(a), and citing *In re Globe Newspaper Co.,* 729 F.2d 47 (1st Cir.1984) ("*Globe*"), informed the press that if it wanted access to the document, the court would hold an access hearing. No portion of the

hearing on the motion to suppress was closed.

On March 31, 1994, this Court issued a memorandum of decision and order denying defendant's motion to suppress, which relied, in part, on the transcript, particularly p. 11. 847 F.Supp. 219. On April 13, 1994, the defendant signed a written plea agreement with the government.

On April 15, 1994, White entered into a plea of guilty on all three counts, and sentencing is scheduled for July 7, 1994. On April 21, 1994, the Globe Newspaper Company ("the Globe") moved to intervene and sought access to the transcript on the ground of the First Amendment and common law right of access. On May 5, 1994, the government filed an opposition to the motion for access to "unlitigated Title III material." The government argues that defendants in a related indictment, *United States v. Kwok-Wah Chan, et al.,* Crim. No. 93–10352–NMG, returned on December 21, 1993, had not yet had the opportunity to litigate the electronic surveillance which resulted in the interception of the June 25, 1989 conversation between White and Kwong. The indictment charges sixteen members of the "Ping On" conspiracy with racketeering, including charges involving bribe payments to Michael J. White. In addition, the government points out that "the privacy rights of third parties and witnesses could also be affected by the disclosure of electronic surveillance material whose legality had not been yet tested." The government does not claim that any disclosure would interfere with ongoing criminal investigations or compromise informant safety.

Prior to scheduling an access hearing, the Court notified defendants in the *Kwok-Wah Chan* case of the Globe's request for access. Defendants Hong Ming Kwong, Cheuk Man Tsang, Kwok-Wah Chan, Jimmy Soo Hoo and Andrew Chu filed a motion to intervene and oppose the Globe's motion for access on the ground that the government is likely to offer the Michael Kwong/Michael White conversation into evidence during the course of the trial of the *Kwok-Wah Chan* case, that they intend to move to suppress the fruits of the Title III wiretap which resulted in the intercepted conversation, and that their right to a fair trial and privacy will be impaired. The Court allows all motions to intervene.

None of the intervening defendants in the *Kwok-Wah Chan* case was a participant in the intercepted conversation introduced as an exhibit in the White suppression hearing although they allege they were participants in the Title III wiretap which led to the intercepted conversation. None of the intervening defendants claim any possessory or property interest in the location where the recording was made. White does not oppose disclosure to the Globe; Michael Kwong is dead.

Defendant Lam Tin Yen, whom the government claims is mentioned in the intercepted conversation, has entered into a plea of guilty and has not opposed the Globe's motion for access. None of the other defendants is mentioned in the intercepted conversation. Third parties, one with state-wide name recognition, are mentioned in passing.

## DISCUSSION

■ The public has a qualified First Amendment right of access to hearings on motions to suppress and documents on which suppression decisions are based. *Matter of New York Times Co.,* 828 F.2d 110, 114 (2d Cir.1987) (*"New York Times"*), cert. denied, 485 U.S. 977, 108 S.Ct. 1272, 99 L.Ed.2d 483 (1988); *United States v. Criden,* 675 F.2d 550, 557 (3d Cir.1982) (right to attend pretrial suppression hearings); *In Re Globe Newspaper Co.,* 729 F.2d 47, 52 (1st Cir.1984) (*"Globe"*) (right of access to bail hearings and documents). "The basis for this right is that without access to documents the public often would not have a 'full understanding' of the proceeding and therefore would not always be in a position to serve as an effective check on the system." *Globe Newspaper Co. v. Pokaski,* 868 F.2d 497, 502 (1st Cir.1989). Cf. *Anderson v. Cryovac, Inc.,* 805 F.2d 1, 13 (1st Cir.1986) ("There is a long-standing presumption in the common law that the public may inspect judicial records).

■ This right of access is not absolute. *Press-Enterprise Co. v. Superior Court of Cal.,* 478 U.S. 1, 9, 106 S.Ct. 2735, 2740–41,

92 L.Ed.2d 1 (1986) (*"Press–Enterprise II"*) (qualified First Amendment right of access to preliminary criminal hearings). While open criminal proceedings give assurances of fairness to both the public and the accused, there are some limited circumstances in which the right of the accused to a fair trial might be undermined by publicity. *Id.* Similarly, the privacy interests of those other than the accused may be implicated. *Id.,* at 9 n. 2, 106 S.Ct. at 2741 n. 2 ("The protection of victims of sex crimes from the trauma and embarrassment of public scrutiny may justify closing certain aspects of a criminal proceeding" (citing *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 607–610, 102 S.Ct. 2613, 2620–22, 73 L.Ed.2d 248 (1982))). *See also Press–Enterprise Co. v. Superior Court of Cal.,* 464 U.S. 501, 510–11, 104 S.Ct. 819, 824–25, 78 L.Ed.2d 629 (1984) (*"PressEnterprise I"*) (voir dire of jurors).

■ Once a qualified First Amendment right of access attaches to a criminal proceeding, the proceeding may not be closed unless specific, on the record findings are made demonstrating that "closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. at 824.

"If the interest asserted is the right of the accused to a fair trial, the preliminary hearing shall be closed only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." *Press–Enterprise II,* 478 U.S. at 14, 106 S.Ct. at 2743.

The Court must now determine whether the qualified First Amendment right of access to documents introduced at suppression hearings has been overcome in this case, which involves Title III materials, as yet untested by defendants in a related case. "[W]here a qualified First Amendment right to access exists, it is not enough simply to

cite Title III. Obviously, a statute cannot override a constitutional right." *New York Times Co.,* 828 F.2d at 115 (The first amendment right of access applies with equal force to exhibits introduced at a suppression hearing).

### 1. *Interests of Intervening Defendants*

■ Relying primarily on *Globe,* the intervenors and the government argue that the public's right of access to a document containing Title III material is limited by the statutory requirements of Title III, 18 U.S.C. § 2510 *et seq.* which sets forth the procedures for sealing and moving to suppress intercepted conversations. Unless a wiretap is conducted in compliance with the provisions of Title III, it is unlawful. 18 U.S.C. § 2511. The fruits of electronic surveillance may not be "received in evidence in any trial, hearing, or other proceeding in or before any court . . . if the disclosure of that information would be in violation of [Title III]." 18 U.S.C. § 2515. Recordings of intercepted communication must be sealed pursuant to court order under the court's direction. § 2518(8)(a). Section 2518(10)(a) allows " 'any aggrieved person' to move to suppress the Title III material in any court proceeding on the ground that the surveillance was not properly authorized, that it was not carried out in conformity with the order of authorization, or that it otherwise failed to comply with the provisions of Title III." *Globe,* 729 F.2d at 54. An aggrieved person must make a suppression motion before the proceeding at which the Title III material is to be introduced as evidence "unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion." 18 U.S.C. § 2518(10)(a). Section 2517(3) provides that any person may disclose lawfully-obtained Title III material "while giving testimony under oath or affirmation in any proceeding held under the authority of the United States. . . ."

■ The analysis in *Globe* of the rights which Title III is designed to protect is helpful here. "The purpose of the suppression remedy is not only to protect the privacy of individuals whose communications are unlawfully intercepted, but also to protect the

public's interest in deterring unlawful searches." *Globe*, 729 F.2d at 54. "[I]f an electronic surveillance has been shown to be unlawful, Title III prevents its fruits from being disclosed to the public, and both Title III and the Fourth Amendment forbid the use of its fruits as evidence in any court proceeding." *Id.* "The suppression provisions of § 2518(9) and § 2518(10)(a) reflect Congress's belief that parties against whom Title III evidence is offered should have an opportunity to examine the documentation and test the legality of the surveillance." *Id.* at 55. However, there is no per se rule against the disclosure of untested Title III material. *Id.* at 58. Even where Title III material is involved, the First Circuit has reaffirmed that the First Amendment right to access does extend to documents containing Title III material, introduced in pretrial criminal proceedings. The *Globe* court held:

> In sum, we find that the First Amendment right of access does extend to bail hearings and to documents filed in support of the parties' arguments at those hearings. We believe, however, that the interests of the press and the public weigh less heavily at this early point in the proceedings than they do later, both because the tradition of openness in bail hearings is not as strong and because the press and public will have later opportunities to examine the material admitted at those hearings. By contrast, the privacy and fair trial interests of the defendants are at their zenith during the bail hearings, since they have not yet had an opportunity to test the material admitted at the hearings. We can scarcely imagine a stronger case for closure than the one now before us, in which the defendants are accused of participation in organized crime, the pretrial publicity is intense, and the material to which the press seeks access is extremely prejudicial. If these bail proceedings must be open to the public, it is difficult for us to conceive of circumstances in which a pretrial proceeding could be closed.

*Id.* at 59.

This action is distinguishable from *Globe* in a number of key ways. First, the defendant in this case, Michael White, did not move to suppress the intercepted conversation and indeed introduced the transcript himself to support his claim of outrageous government conduct. Second, White has entered into a plea of guilty, and is awaiting sentencing. The public interest in understanding the factual basis for the suppression decision, plea bargain, acceptance of the guilty plea and imminent sentencing is high. Third, while there was some initial press coverage, defendants in the *Kwok–Wah Chan* case have not introduced any evidence to show that the pretrial publicity is intense, as it was in *Globe*. Defendants have made no showing that any pretrial publicity would jeopardize their right to a fair trial.

Fourth, unlike *Globe*, none of the defendants who are objecting were participants in the intercepted conversation, or even mentioned in the conversation, or had any possessory or proprietary interest in the location where the conversations were recorded. There is no evidence that they had any legitimate expectation of privacy invaded by the electronic surveillance. *Cf. United States v. Bianco*, 998 F.2d 1112, 1122 (2d Cir.1993) (defendants who were not present at intercepted conversation lack standing to challenge the interception), *cert. denied*, — U.S. —, 114 S.Ct. 1644, 128 L.Ed.2d 364 (1994); *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir.) (defendants, who had no expectation of privacy in another's home and telephone, had no basis to seek suppression), *cert. denied*, — U.S. —, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991). Indeed, the defendants appear to be arguing that they will move to suppress the intercepted conversation as a fruit of an illegally intercepted communication to which they were participants. While they may ultimately be successful in their fruit-of-the-poisonous tree argument, unlike *Globe*, they have not demonstrated that any of their personal privacy interests which Title III is intended to protect are sufficiently at stake to overcome the First Amendment right of access.

Finally, while the material is extremely prejudicial to Michael White and Michael Kwong, now deceased, it contains no statements of the intervening defendants, or attributed to the defendants, or even referenc-

es to the defendants. Although the government will seek to introduce the intercepted conversation as evidence at trial, it does not contain the highly incriminating statements which will be blazoned in the media so as to create a great risk of prejudice to fair trial rights.

■ The intervening defendants have not overcome the qualified First Amendment right of access with their conclusory assertion that publicity might deprive them of a fair trial. The "risk of prejudice does not automatically justify refusing public access to hearings on every motion to suppress." *Press–Enterprise II*, 478 U.S. at 15, 106 S.Ct. at 2743. Further, reasonable alternatives short of impoundment are available if release of this document spawns press coverage. There is no evidence that adverse publicity has reached Worcester or Springfield.

■ Moreover, a rigorous voir dire would assure an unbiased jury. *See United States v. Martin*, 746 F.2d 964, 969–973 (3d Cir. 1984) (strong presumption in favor of access applied to tape transcripts which were not introduced as evidence but were provided to the jury even though publicity from release would make it more difficult to impanel a fair and impartial jury for the remaining defendants). Through voir dire, cumbersome as it may be, "a court can identify those jurors whose prior knowledge of the case would disable them from rendering an impartial verdict." *Press–Enterprise II*, 478 U.S. at 15, 106 S.Ct. at 2743. "[I]mpartial jurors have been selected in many highly publicized criminal cases by the use of a rigorous and searching voir dire of the jury venire...." *Globe*, 729 F.2d at 53 (quoting *Colon Berrios v. Hernandez Agosto*, 716 F.2d 85, 92 (1st Cir.1983)). In short, the defendants have failed to demonstrate a substantial probability that release will jeopardize their fair trial rights, and less restrictive alternatives are available.

### 2. Interests of Third Parties

■ In addition to balancing the privacy and fair trial rights of the intervening defendants, the privacy interests of innocent third parties "should weigh heavily in a court's balancing equation in determining what por-

tions of motion papers in question should remain sealed or should be redacted." *New York Times*, 828 F.2d at 116. "The job of protecting such interests rests heavily upon the shoulders of the trial judge, since all the parties who may be harmed by disclosure are typically not before the court." *Id.* Limited redaction of names of third persons might be appropriate to protect their privacy interests. *Id.*

■ The defendants have not demonstrated that any privacy rights of third parties will be infringed by disclosure of the intercepted conversation. Any impairment is far outweighed by the First Amendment interest at stake—giving the public a full understanding of the outcome of the prosecution of a clerk-magistrate who pleaded guilty to charges of public corruption.

While there are references to third persons, the intercepted conversations reveal no private or intimate information about those persons. Further, the third persons are not participants in the conversation, and there is no evidence that they have any possessory or proprietary information in the recorded location. Indeed, although the government asserts the privacy rights of third persons, the court has scrutinized the intercepted conversation and has failed to find any information in which a third person might have an expectation of privacy. Indeed, most of the references are at worst ambiguous, and appear to mention third persons primarily with respect to their official duties.

### 3. Inaccuracies in Transcript

■ The government and the intervening defendants argue that the transcript should not be disclosed because it is "preliminary" and "inaccurate." To be sure, the document is stamped "preliminary," and anyone who reads the document will quickly discern that it contains misspellings and is replete with unintelligible utterances. However, no one has pointed out any material inaccuracies. Accordingly, they have not made a sufficient showing to overcome the public's right of access.

### ORDER

The Court orders that the intercepted conversation (Exhibit 13) be released within ten days of the date of this order. This will give the parties ample opportunity to appeal.